**QR SPEX, INC., Plaintiff**

v.

**MOTOROLA INC., Oakley Inc., Oakley Sales Corp., and Oakley Direct, Inc., Defendants.**

Case No. SACV 07–00987 CJC (RNBx).

United States District Court,
C.D. California,
Southern Division.

Dec. 4, 2008.

Ayesha Najam, Mark A. Giugliano, Matthew D. Cooper, Phillip T. Bruns, Gibbs and Bruns, LLP, Houston, TX, Jan P. Weir, Monique Heyninck, Stradling Yocca Carlson & Rauth, Newport Beach, CA, Jennifer A. Trusso, Steven M. Hanle, Sheppard Mullin Richter & Hampton LLP, Costa Mesa, CA, John Edward Dowdell, William W. O'Connor, Norman Wohlgemuth Chandler and Dowdell, Tulsa, OK, for Plaintiff.

Gregory K. Nelson, Gregory L. Weeks, Janet Robertson Kaufman, Weeks Kaufman Nelson and Johnson, Solana Beach, CA, for Defendants.

### ORDER GRANTING DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT

CORMAC J. CARNEY, District Judge.

Plaintiff QR Spex Inc. ("QR Spex") alleges that Defendants Motorola Inc., Oakley Inc., Oakley Sales Corp., and Oakley Direct, Inc. (collectively "Oakley") are infringing its United States Patent No. 6,769,767 (the "'767 Patent"). Specifically, QR Spex alleges that two pairs of Oakley Eyewear—the O ROKR and the O ROKR Pro (collectively "Oakley Eyewear") infringe Claim 1 of the '767 Patent. Claim 1 of the '767 Patent, an independent claim, discloses an eyewear comprising of a frame and a Bluetooth transceiver that is "embedded" in that frame.

Oakley now moves for partial summary judgment contending that its eyewear do not infringe Claim 1 of the '767 Patent because the Bluetooth transceivers in the Oakley Eyewear are not embedded within the frame. The Court agrees. The Bluetooth transceivers in the Oakley Eyewear are attached to the frames by clips, screws, posts, and ridges. The Bluetooth transceivers can be easily removed or replaced. They are not permanently set in the frame as Claim 1 of the '767 Patent requires. Consequently, the Oakley Eyewear do not literally infringe the '767 Patent.

Nor do the Oakley Eyewear infringe Claim 1 of the '767 Patent under the doctrine of equivalents. First, the Oakley Eyewear do not perform the same function in the same way as the eyewear claimed in the '767 Patent. Specifically, the ability to easily remove the Bluetooth transceivers from the Oakley Eyewear without destroying the eyewear is a substantial difference from the eyewear claimed in the '767 Patent. Second, QR Spex narrowed its claims in the patent prosecution process to claim only eyewear with a Bluetooth transceiver embedded in the frame. It is now, therefore, estopped from claiming infringement against any and every pair of glasses integrating a Bluetooth transceiver. QR Spex cannot recapture what it gave up during the patent prosecution process.

### I. FACTUAL BACKGROUND

Oakley Inc. and its related companies design, manufacture, and sell sunglasses and other eyewear, including several models of eyewear that have integrated MP3 players and Bluetooth technology. (Declaration of Carlos Reyes ¶ 2 ("Reyes Decl."); Second Amended Compl. ¶¶ 4–5.) Motorola designs, manufactures, and sells wireless communications products. (Fourth Amended Counterclaim ¶ 5.) The Oakley Eyewear are the result of Oakley Inc. and Motorola's collaboration. The Oakley Eyewear are sunglasses with a slightly futuristic appearance. They have earbud-style headphones attached to each temple on swiveling arms. A Bluetooth transceiver on a printed circuit board is placed in an indentation in the right temple of the eyewear. (Decl. of Clinton Cowen ("Cowen Decl.") ¶¶ 13, 16.) The transceiver and circuit board are held in place by a combination of ridges, clips, and posts inside the temple, and a screw-on plastic cover that

goes over the indentation, creating a chamber that protects the Bluetooth apparatus and holds it inside the glasses. (Cowen Decl. ¶ 13; Reyes Decl. ¶ 11.) The Bluetooth transceiver can then create a wireless network with equipment like an MP3 player or cellular phone, allowing a person wearing the Oakley Eyewear to listen to music wirelessly or take telephone calls through his or her sunglasses.

QR Spex is a patent holding company that seeks to license its patent portfolio to other companies. (Decl. of Gregory Swab ("Swab Decl.") ¶ 2.) In April 2000, QR Spex contracted with another company, Frog Designs, to design eyewear with integrated radio transceivers. (*Id.* ¶ 3.) The product of that collaboration was patented in the '767 patent. (*Id.* ¶¶ 5, 6.) QR Spex has not brought any eyewear to market. As described in the '767 patent and figures included in that document, QR Spex's claimed eyewear includes detachable temples with various electronic components embedded within them. ('767 Patent figs.2a–2e.) QR Spex designed its eyewear to allow a user to swap temples depending on which function the user wanted the eyewear to perform including: functioning as headphones, television sets, or child or baby monitors. ('767 Patent col.6–7.) One of the primary applications of QR Spex's claimed eyewear would be to create a Bluetooth network to allow a user to listen to music wirelessly from an MP3 player, as in the Oakley Eyewear. ('767 Patent. col.6 ll.18–44.) The '767 Patent repeatedly describes the Bluetooth transceiver as co-molded within one of the temples of QR Spex's claimed eyewear, while its figures and specification show and describe a transceiver permanently set in a cavity, without a possibility of disassembling the eyewear to remove it. (*See, e.g.,* '767 Patent col.5 ll.48–50.)

QR Spex narrowed the scope of the '767 Patent during prosecution. At one point, Claim 1 of the '767 Patent described an invention simply comprising eyewear and a transceiver. (Decl. of Phillip T. Bruns ("Bruns Decl.") Ex. 6 at 5.) In response to the Patent and Trademark Office's December 11, 2003 rejection of its claims, QR Spex amended Claim 1 to specify a Bluetooth transceiver that would be "embedded" in the frame of the glasses. (Bruns Decl. Ex. 7 at 2.) QR Spex made these changes to accommodate the Patent and Trademark Office's finding that, as originally written, the eyewear described in Claim 1 was anticipated by the U.S. Patent No. 6,629,076 (the "'076 Patent"). (Bruns Decl. Ex. 6 at 3.) The '076 Patent described eyeglasses that would use a wireless connection to display information about a speaker's tone and volume graphically on the lenses of a speaker's glasses. In arguments accompanying its amendment of Claim 1, QR Spex inventors stated that "because the transceiver is *embedded* in the frame of the eyewear, the eyewear itself becomes a wireless communications device communicating with other wireless devices." (Bruns Decl. Ex. 7 at 7.) [1]

QR Spex also cited U.S. Patent No. 6,091,546 (the '546 Patent), as prior art by QR Spex in the background of the '767 Patent. The invention described in the '546 Patent integrates a transceiver in a similar way as the eyewear claimed in the '767 Patent does, and it does not characterize its method of integration as embedded. The '546 Patent claims an "eyeglass

---

**1.** QR Spex made similar narrowing amendments in response to the Patent and Trademark Office's rejection of a second independent claim in the '767 Patent, Claim 22. When the '767 Patent application was originally filed, it included an independent Claim 22 for a distance alarm with a Bluetooth transceiver "mounted on" an eyewear frame. (Bruns Decl. Ex. 7 at 5.) Amending that claim to overcome an objection, QR Spex changed the phrase "mounted on" to "embedded in." (*Id.*)

interface system ... wherein at least one of the first and second temples is hollow and the interface circuitry comprises a multi-chip module disposed within the at least one of the first and second temples." ('546 Patent col. 12 at ll.64–67.) The '546 Patent further shows that its communications circuitry is placed inside a cavity in the temple and enclosed by a cover attached to the frame by four screws. ('546 Patent fig.15.) QR Spex described the '546 Patent as disclosing electronics that were "mounted on" the frame. ('767 Patent col.1 ll.31–33.) In the '767 Patent, QR Spex does not describe the electronic equipment in its claimed eyewear as "disposed" or as "mounted upon" as in the '546 Patent. QR Spex describes the Bluetooth transceiver in the eyewear claimed in the '767 patent as "embedded." ('767 Patent, col.8 ll.1–7.)

## II. THE PATENT–IN–SUIT

The '767 Patent claims a pair of glasses with a Bluetooth transceiver embedded within the temples of their frames. Claim 1 of the '767 Patent is the only asserted independent claim at issue in this motion. It claims:

*An eyewear comprising:*

*a frame; and*

*a Bluetooth transceiver for short distance wireless communication, wherein said Bluetooth transceiver is embedded in said frame and wherein said Bluetooth transceiver is configured to form an ad hoc wireless network with a plurality of devices.*

('767 Patent, col. 8 ll.1–10.)

## III. LEGAL STANDARDS

Summary judgment is proper if the evidence before the court "show[s] that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R.CIV.P. 56(c); see also *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548,

91 L.Ed.2d 265 (1986). A factual issue is "genuine" when there is sufficient evidence such that a reasonable trier of fact could resolve the issue in the non-movant's favor, and an issue is "material" when its resolution might affect the outcome of the suit under the governing law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The moving party bears the initial burden of demonstrating that there are no genuine material issues, and that it is entitled to judgment as a matter of law. *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n,* 809 F.2d 626, 630–31 (9th Cir.1987). Once this burden has been met, the party resisting the motion "must set forth specific facts showing that there is a genuine issue for trial." *Anderson,* 477 U.S. at 256, 106 S.Ct. 2505. In considering a motion for summary judgment, the court must examine all the evidence in the light most favorable to the non moving party. *United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962). The court does not make credibility determinations, nor does it weigh conflicting evidence. *Eastman Kodak Co. v. Image Technical Servs., Inc.,* 504 U.S. 451, 456, 112 S.Ct. 2072, 119 L.Ed.2d 265 (1992).

A determination of infringement requires a two-step analysis. First, the court determines the scope and meaning of the patent claims asserted. *Cybor Corp. v. FAS Techs., Inc.,* 138 F.3d 1448, 1454 (Fed.Cir.1998)(*en banc*). Second, the properly construed claims are compared to the accused device to determine whether there is infringement. *Id.* When performing the first step, the court is to construe the claims of the patent as a matter of law. *Markman v. Westview Instruments, Inc.,* 517 U.S. 370, 372, 116 S.Ct. 1384, 134 L.Ed.2d 577 (1996).

It is a bedrock principle of patent law that the claims of a patent define

the invention to which the patentee is entitled the right to exclude. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed.Cir. 2005)(*en banc*). Accordingly, the words of the claims are of "primary importance" in the effort to determine precisely what is claimed by the patent. *Id.* In construing the claims of a patent, "words of a claim are generally given their ordinary and customary meaning." *Id.* (citation omitted). Proper claim construction begins with the intrinsic evidence associated with the patent, including the claims themselves and the specification. *Id.* at 1317–19. The specification is the primary basis for construing the claims. *Id.* at 1315. The specification is always highly relevant to the claim construction analysis and is the single best guide to the meaning of a disputed term. *Id.* As such, a claim term must be considered "not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification." *Id.* at 1313.

 The intrinsic record is the most important source of information for determining the proper meaning of patent claims. *Phillips*, 415 F.3d at 1317. *See also Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed.Cir.1996.) The intrinsic record provides the context in which one of ordinary skill in the art would construe the claims. *See Metabolite Labs., Inc. v. Lab. Corp. of Am. Holdings*, 370 F.3d 1354, 1360 (Fed.Cir.2004); *Ferguson Beauregard v. Mega Sys., LLC*, 350 F.3d 1327, 1338 (Fed.Cir.2003) ("The words used in the claims must be considered in context and are examined through the viewing glass of a person skilled in the art."). To gain the proper context, claims "must be read in view of the specification, of which they are a part." *Phillips*, 415 F.3d at 1314 (citations omitted). "The close kinship between the written description and the claims is enforced by the statutory requirement that the specifica-

tion describe the claim in 'full, clear, concise, and exact terms.'" *Id.* at 1316 (citing 35 U.S.C. § 112 ¶ 1). Internal consistency is extremely important:

> Indeed, the rules of the PTO require that application claims must "conform to the invention as set forth in the remainder of the specification and the terms and phrases used in the claims must find clear support or antecedent basis in the description so that the meaning of the terms in the claims may be ascertainable by reference to the description."

*Id.* at 1316–17 (citing 37 C.F.R. § 1.75(d)(1)).

The Federal Circuit generally views extrinsic evidence as "less reliable than the patent and its prosecution history in determining how to read claim terms." *Phillips*, 415 F.3d at 1318. The Federal Circuit views extrinsic evidence as less reliable than intrinsic evidence for several reasons: (1) extrinsic evidence was not part of the patent nor was it created at the same time as the patent to explain a patent's scope and meaning; (2) while claims are to be construed as a person skilled in the art, extrinsic evidence may be not written for skilled artisans and may reflect the wrong perspective; (3) extrinsic evidence generated for the purpose of litigation may be subject to bias, especially if it is not subject to cross-examination; (4) the unbounded universe of potential extrinsic evidence offers litigants a chance to present pieces of evidence of marginal value, leaving the court to separate the wheat from the chaff; and (5) reliance on extrinsic evidence may change the meaning of the words in derogation of the publicly available patent materials, undermining the patent system's function of giving notice to the public. *Id.* at 1318–19.

 Because of the unreliability of extrinsic evidence, courts are reluctant to consider it unless claim language remains

genuinely ambiguous after consideration of the intrinsic evidence. *Interactive Gift Express, Inc. v. Compuserve Inc.*, 256 F.3d 1323, 1332 (Fed.Cir.2001). Even if extrinsic evidence is considered, however, it cannot be used "to vary, contradict, expand, or limit the claim language from how it is defined, even by implication, in the specification or file history." *Bell Atl. Network Servs., Inc. v. Covad Commc'ns Group, Inc.*, 262 F.3d 1258, 1269 (Fed.Cir.2001). To do so would vitiate the right of parties to rely on the intrinsic evidence of the patent that comprises the public record. "Competitors are entitled to rely on the public record of the patent, and if the meaning of the patent is plain, the public record is conclusive." *Key Pharms. v. Hercon Lab. Corp.*, 161 F.3d 709, 716–17 (Fed.Cir.1998).

## IV. CONSTRUCTION OF CLAIM 1 OF THE '767 PATENT

The Court construes that the term embedded to mean "permanently set in the frame" of the eyewear. The Court's construction is based on the plain language of Claim 1 of the '767 Patent and additional information contained in the '767 Patent, including the specification.

The ordinary meaning of Claim 1's language is "readily apparent," so "claim construction in [this case] involves little more than the application of the widely accepted meaning of commonly understood words." *Phillips*, 415 F.3d at 1314 (citation omitted). Claim 1 of the '767 Patent requires that a "Bluetooth transceiver is embedded in said frame" of the eyewear. ('767 Patent col.8 ll.6–7.) The plain language of Claim 1 requires that the Bluetooth transceiver be permanently set in the frame of the eyewear. This construction, as opposed to the Bluetooth transceiver merely being attached, clipped in, or screwed down to the frame, is further supported by other language and information in the '767 Patent.

For instance, the specification of the '767 Patent consistently refers to the Bluetooth transceiver being "molded" or "co-molded" into the eyewear: "A battery powering the transceiver and other co-molded devices can also be co-molded within one of the temples...." ('767 Patent col.2 ll.53–57.) The "Brief Description of Drawings" describes eyewear with transceivers "co-molded" within the frame: "FIG. 2e is a diagram showing the hinge, connector and circuitry such [as a] Bluetooth PCB before being molded into the temple." ('767 Patent col.3 ll.27–29.) The '767 Patent's "Detailed Description" of the QR Spex eyewear also suggests that the transceiver is permanently set in the frame:

> Temple 20 has co-molded within its body an apparatus 36. Apparatus 36 can be, for example, an audio device, a camera, a speaker, a microphone, and a display device such as a liquid crystal or an alarm. The apparatus includes electrical circuitry for operation in an electronics package such as a Bluetooth module with PCB [Printed Circuit Board].

('767 Patent col.5 ll.48–53.) These descriptions imply that the Bluetooth transceiver cannot be removed because co-molded manufacturing means that the material of the frame is molded around the transceivers, and then hardened.

The figures in the '767 Patent also support the Court's construction of the word "embedded." Figures 2a and 2c show the "apparatus," which would include the Bluetooth transceiver, fully embedded within the frames of the eyewear; no seams or screws are visible to suggest that it could be removed without breaking open the frames. Figure 2a shows the transceiver to be permanently set within the frames of the glasses without indicating seams or screws that would facilitate one's ability to remove the transceiver without breaking

the frames. ('767 Patent fig.2a.) Figure 2c further illustrates a fully fabricated eyeglass stem, in which the surrounding plastic material has filled in all the space around the transceiver without seams, leaving it set permanently in place. ('767 Patent fig.2c.) Figure 2e shows the transceiver placed within the frame prior to the completion of the fabrication of the eyewear. In figure 2e, the transceiver is exposed, sandwiched between two thin, flat, pieces of material. ('767 Patent at fig.2e.) As depicted in the figure, the transceiver cannot be removed without damaging the sandwiching materials. Figures 8 and 9 show the Bluetooth transceiver seamlessly placed within the frame; while figures 9 and 10 show the earphone components that are meant to be removable being removed, there is no such illustration of the removability of the Bluetooth transceiver. All of the figures in the '767 Patent have this attribute in common: there is nothing in them that indicates one would be able to remove or separate the Bluetooth transceiver from the temples without destroying the structure of the frames in the process. Each figure depicts transceivers permanently set in the frames.

The '767 patent's discussion of the likely methods of manufacturing the eyewear is also instructive:

> The eyewear is manufactured in a process to create electrical components contained throughout the entire frames and temples. Electrical components discussed above and electrical conductors are embedded in the temple and frame portions for the purpose of supplying electrical energy to the various components. In one method some or all of the components, including the conductive wires are co-molded into the temples and frames. This is an in-process method where the components are inserted into the temple and frame tools. The mold cycle is started, plastic material flows into the core and covity of the tool,

and the components are permanently set in the rigid temples and frames.

('767 Patent col.7 ll.39–51.) This paragraph describes the primary production method that the patent repeatedly sets forth: co-molding the plastic frames around the electronic apparatus so as to embed it within the frame. It also describes the production method's object: to embed—or "permanently set"—the components within the frame.

The easy interchangeability of the temples of the eyewear claimed in the '767 patent also suggest that the term embedded should be construed as permanently set in the frame of the eyewear. The claimed eyewear is described as having detachable temples that can be switched to change the electronic functions of the eyeglasses:

> The invention contemplates eyewear with interchangeable temples housing a transceiver enabled with small-range wireless network technology, which allows the provided eyewear to form small-range ad-hoc networks with other devices equipped with similar transceivers.

> The eyewear includes a frame and connected to the frame are two temples. The temples are connected to the frame hinges.... The temples can be removed by pulling the connector apart, and a temple with a different apparatus within it can be inserted in place of the removed temples.

('767 Patent col.2 ll.43–58) The patent not only discusses the Bluetooth transceiver as being housed in one of these detachable, interchangeable temples; it also discusses the possibility of embedding other communications devices, including child monitors, audio devices, cameras, speakers, microphones, or displays within other interchangeable temples. (*Id.*) If the transceiver in the claimed eyewear were

to malfunction, one would simply replace that temple with a new interchangeable temple with a new transceiver. With such easily interchangeable temples, there would be no reason to be able to access or remove a Bluetooth transceiver from its position embedded within the frame of the temple. The easy interchangeability of the temples in this design makes it more practical for QR Spex to set the transceiver permanently within the frame.

QR Spex suggests that the meaning of embedded should be construed as "fixed firmly or snugly in the frame." (Pl's Op. Brf. at 1.) Because this construction is largely unsupported by the '767 Patent itself—unlike the Court's construction, which is taken directly from the text of the '767 Patent—QR Spex largely relies on extrinsic evidence to argue for its preferred construction. Courts disfavor extrinsic evidence as unreliable for multiple reasons. *Phillips*, 415 F.3d at 1318–19. For instance, extrinsic evidence is not relied on by the patentee during the prosecution process so it has only marginal relevance to explaining the scope and meaning of the claims of the patent. Considering extrinsic evidence also allows the parties to submit a wide variety of evidence of disparate quality, leaving the Court to determine what pieces are probative. *Id.* Extrinsic evidence may also distort the meaning of the words in the patent, undermining the patent system's function of providing public notice. *Id.* QR Spex's extrinsic evidence here has these reliability problems.[2] In any event, the Court finds no reason to resort to QR Spex's extrinsic evidence because the

meaning of the word embedded is readily apparent from the intrinsic record.

Before turning to the issue of infringement, the Court would be remiss if it did not address the primary intrinsic argument QR Spex makes in support of its proposed construction of "embedded." This argument is based on a misguided interpretation of a section outlining a possible manufacturing method for its claimed eyewear. The language QR Spex relies on, which immediately follows the description of the co-molded method, states:

Alternatively, the method of manufacture may be that some or all of the components, including the conductive wires, are assembled into piece parts that make up the temples and frames. The piece parts that make up the temples and frames are designed and injection molded to facilitate easy insertion and assembly of mechanical and electrical components. Further, a combination of the co-molded and assembled components may be used to maximize efficiency.

('767 Patent col.7 ll.51–60.) Although QR Spex argues that this paragraph supports the proposition that that the word embedded means "fixed firmly or snugly in the frame," this is not the case. Something inserted or assembled into the frame can be permanently fixed just as something co-molded is permanently fixed. The description of the manufacturing method is silent as to whether the transceiver is fixed within the frame firmly, permanently, or at all. This language says nothing about how the transceiver is actually set in the frame.

---

**2.** For instance, both parties marshal conflicting dictionary definitions as extrinsic evidence to support their interpretations of the term embedded. *See Def.'s Brf. in Support of Summary Judgment for Non–Infringement,* at 11–12; *Pl.'s Brf in Opposition to Summary Judgment for Non–Infringement,* at 14–15. Furthermore, QR Spex argues that other pat-

ents and technical documents support a broad construction of embedded. However, in prosecuting one of its own related patent applications, QR Spex uses the term co-molded as a synonym for embedded when attempting to patent a method for integrating a Bluetooth transceiver into eyewear. (Supp. Nelson Decl., Ex. 2 at 4–5).

## V. THE OAKLEY EYEWEAR DO NOT LITERALLY INFRINGE CLAIM 1 OF THE '767 PATENT

■ "Literal infringement of a claim exists when each of the claim limitations reads on, or in other words is found in, the accused device." *Allen Engineering Corp. v. Bartell Industries, Inc.*, 299 F.3d 1336, 1345 (Fed.Cir.2002) (citations and quotations omitted). In *Bai v. L & L Wings,* the Federal Circuit held that a "target game" did not infringe on a patent of a different "target game" because the patent claimed a game with a hemispherical target, and the allegedly infringing game had a target that was partially flat. *Bai v. L & L Wings,* 160 F.3d 1350 (Fed.Cir.1998.) The Federal Circuit construed hemispherical as "less than a sphere, but … nevertheless, a part of a sphere" and held that the accused target game did not literally infringe because it was predominantly flat. *Id.* at 1354. Similarly, the Court's construction of the word embedded leads to the inescapable conclusion that the Oakley Eyewear do not literally infringe Claim 1 of the '767 Patent.

■ Unlike the transceiver in the eyewear claimed in the '767 Patent, which was co-molded or inserted into a detachable frame so as to be permanently set in the frame, the transceivers in the Oakley Eyewear are attached to the frame via plastic connectors and ridges, and then held in place by a cover secured by screws. (Cowen Decl. ¶¶ 13–14.) Any person could remove the printed circuit board including the transceiver in two easy steps by: (1) unscrewing the cover; and (2) unfastening the connectors. Then, a new transceiver could be attached without damaging the frame. Because the transceiver can be taken out and replaced without damaging a pair of the Oakley Eyewear, the Bluetooth transceiver is not permanently set in the frame. It is merely attached to the frame and can be detached. Furthermore, after removal of the transceiver, the cover of the area that once contained the transceiver can be screwed back on, and the eyewear would remain intact.

The way the Bluetooth transceivers are integrated into the Oakley Eyewear is a marked departure from the embedded integration of the transceiver in the eyewear claimed in the '767 Patent. Because that transceiver is permanently set in the frame of the eyewear, removing the transceiver from that eyewear would require more than a screwdriver. Removing the transceiver from the eyewear would result in the eyewear's destruction. No reasonable jury could find that the Oakley Eyewear, with its impermanent, removable, Bluetooth transceiver, directly infringes Claim 1 of the '767 Patent, which requires the eyewear to contain a permanent—embedded—transceiver.

## VI. THE OAKLEY EYEWEAR DO NOT INFRINGE THE '767 PATENT UNDER THE DOCTRINE OF EQUIVALENTS

■ The Oakley Eyewear also do not infringe Claim 1 of the '767 Patent under the doctrine of equivalents. For the doctrine of equivalents to apply, there must be only insubstantial differences between a missing claim element and corresponding aspects of the accused device. *See Sage Prods., Inc. v. Devon Indus., Inc.,* 126 F.3d 1420, 1423 (Fed.Cir.1997). In no circumstances may the doctrine of equivalents be "allowed such broad play as to effectively eliminate [a claim] element in its entirety." *Warner–Jenkinson Co. v. Hilton Davis Chem. Co.,* 520 U.S. 17, 29, 117 S.Ct. 1040, 137 L.Ed.2d 146 (1997). If any of the claim limitations is totally absent in an accused device, the doctrine of equivalents is inapplicable. *See DeMarini Sports, Inc. v. Worth, Inc.,* 239 F.3d 1314, 1332 (Fed.Cir.2001). In other words, the

plaintiff alleging infringement must establish that the accused product meets every limitation of the patent claim. *See Warner–Jenkinson*, 520 U.S. at 29, 117 S.Ct. 1040 ("Each element contained in a patent claim is deemed material to defining the scope of the patented invention . . . ."); *see also Freedman Seating Co. v. Am. Seating Co.*, 420 F.3d 1350, 1358 (Fed.Cir.2005) (citing *Warner–Jenkinson*, 520 U.S. at 29, 117 S.Ct. 1040) ("[A]n element of an accused product or process is not, as a matter of law, equivalent to a limitation of [a] claimed invention if such a finding would entirely vitiate the limitation.").

 The doctrine of equivalents allows patentees to protect against infringement by "insubstantial alterations" not captured in the patent claim that entail only "trivial changes." *Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co., Ltd.*, 535 U.S. 722, 733, 122 S.Ct. 1831, 152 L.Ed.2d 944 (2002). Whether a product infringes under the doctrine of equivalents is a question of fact for the jury unless the evidence is such that no reasonable jury could determine two elements to be equivalent. *See Warner–Jenkinson Co., Inc. v. Hilton Davis Chem. Co.*, 520 U.S. 17, 39 n. 8, 117 S.Ct. 1040, 137 L.Ed.2d 146 (1997).

 To determine whether an invention infringes under the doctrine of equivalents, a court analyzes whether the accused device and the claimed invention in the patent perform substantially the same function in substantially the same way with substantially the same result. *Stumbo v. Eastman Outdoors*, 508 F.3d 1358, 1364 (Fed.Cir.2007) ("A finding of infringement under the doctrine of equivalents requires a showing that the difference between the claimed invention and the accused product was insubstantial. One way of doing so is by showing on a limitation-by-limitation basis that the accused product performs substantially the same function in substantially the same way with substantially the

same result as each claim limitation of the patented product.") (citations omitted). The Federal Circuit in *Stumbo* determined that the doors to one collapsible hunting blind did not infringe the doors of another collapsible hunting blind under the doctrine of equivalents because the doors to each blind were designed in substantially different ways. *Stumbo*, 508 F.3d at 1365. In that case, the plaintiff's hunting blind's entrance was a zippable vertical slit in the fabric of the hunting blind while the defendant's entrance was a triangular flap of fabric: both allowed entrance and egress to the hunting blind, but both allowed it in substantially different ways. *Id.* at 1360–61, 1365. The plaintiff's one-zipper hunting blind door had to be flexed open to allow entrance and closed itself, while the defendant's two-zipper door required no flexing and could remain open by rolling up the flap. *Id.* at 1365.

 In this case, the Oakley Eyewear achieve their function of integrating Bluetooth transceivers with eyeglasses in a substantially different way than the eyewear described in Claim 1 of the '767 Patent. The eyewear disclosed in Claim 1 integrates a Bluetooth transceiver into eyeglasses by embedding a transceiver into a removable, interchangeable temple, either by co-molding or inserting the transceiver into the temple, so that it cannot be removed. With the transceiver fixed inside the interchangeable temple, the temple snaps onto the front portion of the eyeglasses. If one transceiver fails, the entire temple can be replaced. In contrast, the transceivers in the Oakley Eyewear are placed inside a cavity in the temple, and snap into place using plastic posts and clips. (Reyes Decl. ¶ 11.) The transceiver is then protected and held into place by a soft pad and a plastic cover, secured by two screws. (*Id.*) In this method, the transceiver itself (and the printed

circuit board it is affixed to) can be removed from the eyewear and replaced or repaired, or taken out altogether, without affecting the overall function of the eyewear. This is a substantial difference in design, construction, and function from the eyewear claimed in the '767 Patent.

QR Spex is also estopped from arguing that the Oakley Eyewear infringe Claim 1 of the '767 Patent under the doctrine of equivalents. QR Spex narrowed its claims in the patent prosecution process, precluding it from claiming infringement against any pair of eyewear integrating a Bluetooth transceiver, except eyewear with a Bluetooth transceiver embedded in its frame. When a patentee originally claims subject matter in a patent, but then narrows the claim in response to a rejection of the patent application, it is presumed that the patentee is estopped from raising the doctrine of equivalents on any matter surrendered between the original and the narrower amended claims. *Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co., Ltd.* 344 F.3d 1359, 1366–67 (Fed.Cir.2003). A narrowing amendment can occur either by amending an existing limitation or by adding a limitation. *Honeywell Int'l Inc. v. Hamilton Sundstrand Corp.*, 370 F.3d 1131, 1140 (Fed.Cir.2004). The United States Supreme Court has stated that prosecution history estoppel is an important part of insuring the integrity of the patent system by narrowing the application of the doctrine of equivalents:

> Prosecution history estoppel ensures that the doctrine of equivalents remains tied to its underlying purpose. Where the original application once embraced the purported equivalent but the patentee narrowed his claims to obtain the patent or to protect its validity, the patentee cannot assert that he lacked the words to describe the subject matter in question. The doctrine of equivalents is premised on language's inability to capture the essence of innovation, but a prior application describing the precise element at issue undercuts that premise. In that instance the prosecution history has established that the inventor turned his attention to the subject matter in question, knew the words for both the broader and narrower claim, and affirmatively chose the latter.

*Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co., Ltd.,* 535 U.S. 722, 734, 122 S.Ct. 1831, 152 L.Ed.2d 944 (2002). For example, in *Biagro Western Sales, Inc. v. Grow More Inc.,* the plaintiff was subject to prosecution history estoppel when it narrowed its claims to distinguish them from prior art. *Biagro Western Sales, Inc. v. Grow More Inc.,* 423 F.3d 1296, 1305–1306 (Fed.Cir.2005). The Federal Circuit found that Biagro surrendered claims to alternative formulations of its fertilizer with respect to proportions of phosphorous-containing acid or salt because it specified a range for those chemicals in order to get the Patent and Trademark office to issue its patent. *Id.*

Here, QR Spex narrowed its claim from one encompassing all eyewear with attached transceivers to a claim encompassing only eyewear with *Bluetooth* transceivers *embedded* within the frame. In its "Response to Office Action" to the United States Patent and Trademark Offices on January 13, 2007, QR Spex amended Claim 1 as follows:

1. An eyewear comprising:

*a frame; and*

a *Bluetooth* transceiver for short-distance wireless communication, *wherein said Bluetooth transceiver is embedded in said frame, and wherein* said *Bluetooth* transceiver ~~being~~ is configured to form ~~capable of forming~~ an ad hoc wireless network with a plurality of devices.

(Nelson Decl. Ex. 7, Response to Office Action, at 2.) Before the January 13, 2007 response, Claim 1 claimed "An eyewear comprising a transceiver for short-distance wireless communication, said transceiver is configured to form an ad hoc wireless network with a plurality of devices." QR Spex initially claimed all eyeglasses with integrated transceivers. QR Spex narrowed this claim to refer specifically to eyewear with a Bluetooth transceiver embedded within a frame. The narrowing not only specified the type of transceiver required, it also specified the method by which it is to be integrated into the eyewear claimed in the '767 Patent. QR Spex narrowed its claim to specify only one method of integrating a Bluetooth transceiver with a pair of glasses. Because of this, QR Spex is now estopped from arguing that any method of integrating a Bluetooth transceiver and eyewear infringes under the doctrine of equivalents. QR Spex cannot recapture what it surrendered. It can only argue infringement as to eyewear that has a Bluetooth transceiver embedded or permanently set in the frame.

■ QR Spex argues that its amendment to add "embedded in said frame" bears no more than a tangential relation to the equivalent in question. If a party can show that "the rationale underlying the narrowing amendment bears no more than a tangential relation to the equivalent in question," then it can rebut the presumption of prosecution estoppel. *Festo*, 535 U.S. at 740, 122 S.Ct. 1831. On remand, the Federal Circuit further refined what it means for a narrowing amendment to be tangential:

> In other words, this criterion asks whether the reason for the narrowing amendment was peripheral, or not directly relevant, to the alleged equivalent. Although we cannot anticipate the instances of mere tangentialness that may arise, we can say that an amend-

ment made to avoid prior art that contains the equivalent in question is not tangential; it is central to allowance of the claim.... [T]he inquiry into whether a patentee can rebut the *Festo* presumption under the "tangential" criterion focuses on the patentee's objectively apparent reason for the narrowing amendment.

*Festo*, 344 F.3d at 1369.

■ QR Spex argues that its addition of the limitation embedded merely specified that the eyewear and transceiver were integrated as one device and did not specify any method of integration. QR Spex's argument of no tangential relation is not persuasive. Its amendment surrendered a much broader scope. The amendment was made in direct response to the Patent and Trademark Office's rejection over the '076 Patent. In its brief opposing summary judgment for non-infringement, QR Spex specifically admitted that "adding the limitation that the transceiver was embedded in the frame ... was intended to narrow the scope of Claim 1 and its dependent claims by narrowing the relationship between the frame and the transceiver to one where the later is fixed firmly within the former." (*Id.* at 13–14.) Later in the same brief, QR Spex makes the contradictory argument that it merely made its amendment—adding the word embedded—to show that the transceiver was integrated into the eyewear, not to specify the method by which it integrated the transceiver into the eyewear. However, the text of Claim 1 already claimed a device that integrated a transceiver into eyewear before QR Spex added the term embedded. Claim 1 originally disclosed "an eyewear comprising a transceiver." Making a change to specify that the transceiver is embedded in the eyewear describes *how* the transceiver is set in the eyewear. It has very little to do with

1254

claiming integration. QR Spex's narrowing of Claim 1 so the Patent and Trademark Office would issue the '767 Patent is not tangential. It was made to avoid the prior art.

## VII. CONCLUSION

For all the reasons set forth above, the Court finds that the accused Oakley Eyewear do not infringe the '767 Patent either literally or under the doctrine of equivalents. Accordingly, the Court grants partial summary judgment of non-infringement in favor of Defendants.